## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

SCALE VIDEO CODING LLC,

                  Plaintiff,

     v.

CISCO SYSTEMS, INC.,

                  Defendant.

Civil Action No. 4:25-cv-95

JURY TRIAL DEMANDED

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Scale Video Coding LLC ("SVC" or "Plaintiff"), for its Complaint against Defendant Cisco Systems, Inc. ("Cisco" or "Defendant") alleges the following:

### NATURE OF THE ACTION

1.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*.

### THE PARTIES

2.      Plaintiff SVC is a limited liability company organized under the laws of the State of Delaware with a place of business at 717 N. Union Street, Wilmington, Delaware 19805.

3.      Upon information and belief, Defendant is a corporation organized under the laws of the State of Delaware with a place of business at 170 West Tasman Drive, San Jose, California.  Defendant can be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

4.      This Court has personal jurisdiction over Defendant at least because Defendant regularly conducts and transacts business, including infringing acts described herein, in this

District.  Defendant conducts business in Texas, directly or through intermediaries and offers products or services, including those accused herein of infringement, to customers, and potential customers located in Texas, including in the Eastern District of Texas, and introduces infringing products and services into the stream of commerce knowing that they would be sold and/or used in this judicial district and elsewhere in the United States.

## JURISDICTION AND VENUE

5.      This is an action for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code.

6.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

7.      Defendant is subject to this Court's specific and general personal jurisdiction pursuant to due process or the Texas Long Arm Statute, because Defendant conducts substantial business in this forum, including: (i) making, using, selling, importing, and/or offering for sale the Accused Instrumentalities as described herein; or (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to citizens and residents in Texas and in this District.

8.      Venue is proper in this judicial district under 28 U.S.C. §1400(b).  Defendant maintains a regular and established places of business in the state of Texas and the Eastern District of Texas, including at 2250 East President George Bush Turnpike, Richardson, Texas 75082 (*see* https://www.cisco.com/c/en/us/about/contact-cisco.html).

## BACKGROUND

### The '372 Patent

9.      Erik Van Zijst is the inventor of U.S. Patent No 11,019,372 ("the '372 patent"). A true and correct copy of the '372 patent is attached as Exhibit 1.

10.     The '372 patent resulted from the pioneering efforts of Mr. Van Zijst (hereinafter "the Inventor") in the area of network management.  These efforts resulted in the development of a method and apparatus for the management of data packets to support multicasting, or supporting one-to-many communication over the Internet, within the last five years.

**Technology Background**

11.     The patented inventions disclosed in the '372 patent resolve technical problems related to network management, particularly problems related to the utilization of video routers in multicasting data packets.

12.     The claims of the '372 patent do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '372 patent recite inventive concepts that are deeply rooted in engineering technology, and overcome problems specifically arising out of how to manage the transfer of data packets over a network.

13.     Specifically, the '372 patent is directed to scalable video coding, a video coding methodology that enables efficient video transmission and decoding over various network conditions and device capabilities. Unlike conventional video encoders that provide a fixed resolution and quality, scalable video coding allows for the encoding of video data into multiple layers or streams, each representing different levels of quality or resolution.  These layers are typically referred to as spatial, temporal, and/or quality layers.

14.     The concept of video compression dates back to the 1920s when R.D. Kell proposed transmitting only the portions of a scene that changed between frames.  In the 1950s, researchers at Bell Labs proposed differential pulse-code modulation (DPCM) for video coding. The idea of inter-frame motion compensation was introduced in 1959 by NHK researchers.

15.     One of the initial motivations for video coding standards was to fit compressed video within the limited bandwidth available for telecommunication networks at the time. Another goal was to address all aspects of practical video transmission, storage, or broadcast within a single standard.

16.     As video applications diversified, the need arose for scalable coding techniques that could adapt video quality to varying network conditions and device capabilities.  Scalable coding allows encoding a video bitstream with multiple layers, each providing a different level of quality or resolution.

17.     At the time of the inventions claimed in the '372 patent, the then-prevalent H.264/AVC video coding standard, also known as Advanced Video Coding, lacked scalability features.  Rather, H.264/AVC employs a fixed set of compression parameters during encoding, such as frame size, frame rate, and picture quality.  Once the video is encoded with these parameters, it cannot easily adapt to changes in network conditions, device capabilities, or user preferences.  This lack of flexibility makes it challenging to deliver the same video content efficiently across different platforms and network environments.

18.     Specifically, H.264/AVC uses a single layer encoding approach, where the entire video sequence is encoded as a single data stream.  This means that all the information necessary for decoding the video is contained within this single layer.  Without the concept of scalability layers, it was not possible to selectively decode portions of the video stream to adapt to varying network bandwidths or device capabilities.

19.     Since H.264/AVC did not support scalability features like temporal, spatial, or quality scalability, it could not adapt dynamically to changing network conditions or display resolutions.  This limitation becomes particularly problematic in scenarios where network

bandwidth fluctuates or where the end-user devices have varying display capabilities.  The quality of the encoded video is therefore uniform throughout the entire video sequence. H.264/AVC did not offer a mechanism to prioritize certain parts of the video for higher quality encoding or to allocate more bits to critical regions of the frame.  As a result, it may not be optimal for scenarios where some parts of the video require higher fidelity than others.

20.    Adding scalability features to a video coding standard like H.264/AVC introduces additional complexity in both the encoding and decoding processes.  Since H.264/AVC was already a highly complex standard, introducing scalability features would have significantly increased its complexity, potentially affecting its widespread adoption and implementation.

21.    At the time of the inventions of the claims of the '372 patent, network bandwidth was a significant issue affecting streaming video.  Internet speeds then were much slower compared to today.  Broadband internet was still emerging, and most users relied on dial-up connections or early broadband technologies like DSL or cable internet, which offered much lower bandwidth compared to modern standards.

22.    With the rise of online video streaming, multimedia-rich websites, and peer-to-peer file sharing, the demand for bandwidth-intensive content was increasing rapidly.  The available network infrastructure struggled to keep up with this demand, leading to congestion and slowdowns, particularly during peak usage hours.  However, because of the aforementioned lack of adaptability in conventional H.264/AVC video coding, video content could not be efficiently transmitted over networks with varying bandwidth capacities, leading to buffering, stuttering, and reduced video quality.

23.    Building and maintaining high-capacity network infrastructure was costly, especially for internet service providers (ISPs). Limited resources and competing priorities meant

that network upgrades were often incremental and lagged behind the rapidly growing demand for bandwidth.

24.    Moreover, devices accessing online content devices had different screen sizes, resolutions, and processing capabilities, further complicating the challenge of delivering video content optimized for each device over limited network bandwidth.

25.    These challenges with network bandwidth affected unicast, simulcast, and multicast transmissions.

26.    Unicast refers to a one-to-one communication model, where data is transmitted from a single sender to a single receiver.  Bandwidth limitations impacted unicast transmissions significantly because each viewer required a separate stream from the server.  With limited network bandwidth, delivering individual video streams to each viewer simultaneously could strain network resources and lead to congestion, buffering, and reduced video quality.

27.    Simulcast involves transmitting multiple versions of the same video content simultaneously, each optimized for different network conditions or device capabilities. Bandwidth constraints affected simulcast transmissions by limiting the number of versions that could be delivered efficiently.  With limited bandwidth, it was challenging to maintain multiple simultaneous streams at different quality levels without overloading the network or compromising the viewing experience.

28.    Multicast enables the efficient distribution of data to multiple recipients simultaneously by replicating data packets only when necessary, reducing network bandwidth usage.  However, multicast transmission relies on network infrastructure support, and its effectiveness can be limited by network configuration, router capabilities, and compatibility with end-user devices.  Bandwidth limitations could still impact multicast transmissions if the

network infrastructure was insufficient to handle the volume of multicast traffic or if network paths were congested.

29.     In contrast, scalable video coding offers several technical benefits that have helped reduce network bandwidth consumption.

30.     First, scalable video coding uses a layered coding approach where the video is encoded into a base layer with lower resolution/frame rate, and one or more enhancement layers that add higher resolution/frame rate data.  This allows receivers to decode only the layers they can support based on their bandwidth constraints, reducing unnecessary transmission of high-quality layers over limited bandwidth links.  Moreover, encoding the video into a single, multi-layered bitstream that can be adapted by dropping packets/layers as needed avoids the need for separate encoding of multiple bitstreams for different bandwidth conditions, significantly reducing overall bandwidth requirements compared to simulcasting multiple streams.

31.     Specifically, the base layer of the scalable video coding bitstream is encoded at a relatively low bit rate, providing a basic low-resolution and low-frame-rate video stream.  This base layer can be transmitted even over lower bandwidth network paths, ensuring at least a minimal video quality for all receivers.

32.     On top of the base layer, one or more enhancement layers are encoded at progressively higher bit rates, adding higher resolutions, frame rates, and quality levels to the video stream.  Each enhancement layer incrementally increases the bit rate and quality.  The key benefit of the layered approach is that receivers can adapt to their available network bandwidth by decoding only the base layer and as many enhancement layers as their bandwidth allows. Receivers with limited bandwidth do not receive higher bit rate enhancement layers, reducing the effective bit rate and bandwidth consumption while still receiving a usable video stream.

33.     The bit rates of the base and enhancement layers can also be carefully chosen to balance video quality and bandwidth requirements across diverse network conditions and device capabilities.  Lower bit rates reduce bandwidth consumption but also lower video quality, while higher bit rates provide better quality at the cost of increased bandwidth usage.

34.     Second, scalable video coding provides three types of scalability: temporal scalability, which allows dropping complete frames from the bitstream, reducing the frame rate and hence bandwidth for low-bandwidth receivers; spatial scalability, which enables transmitting lower spatial resolutions by dropping enhancement layers, reducing bandwidth for smaller displays; and quality scalability, which allows dropping quality enhancement layers, lowering the video quality and bandwidth requirements.  This fine-grained scalability across multiple dimensions optimizes bandwidth utilization for diverse receivers.

35.     Third, the scalable video coding bitstream can be truncated within the network itself as it traverses from high to low bandwidth links.  This in-network adaptation eliminates the need to fully decode and re-encode the stream at intermediate nodes, reducing computational overhead and enabling more efficient bandwidth utilization.

36.     Prior to the inventions of the '372 patent, the most widely implemented technology to address network management in video streaming routers was to discard data packets that could not be forwarded to the data recipient due to congestion of the out-bound link. In that type of system, the data stream (that is eventually received by one or more receivers further down the network) is corrupted (due to packet loss).  Network congestion may also negatively impact the communication sessions of other nodes that communicate through a "bottleneck" router.  The '372 patent describes sending data packets from a data source to more

than one receiver, ideally without putting extra stress on the network or source when the number of receivers increases.

37.    For example, the '372 patent describes a method whereby receivers tell the network which data streams each receiver wants to receive and allows the network to compute data distribution paths to deliver only the required packets to each receiver.  As an additional example, the '372 patent describes a method of letting the source encode the list of receivers in each data packet, thereby freeing the network from the potentially computationally intensive task of maintaining multicast distribution paths.  As a further example, the '372 patent describes a method in which the network is configured apply a full broadcast mechanism (i.e. each packet is delivered to every connected node), and in which each receiver uses some defined logic to select only desired packets.

38.    As such, routers implementing the inventions of the '372 patent must implement the capability to tell the network which data streams are to be delivered to each receiver and utilize the network-computed data distribution paths to deliver only the desired packets to each receiver.  (See '372 patent at 3:11-15.)  Prior to the patented inventions, data packets would be discarded if bandwidth bottlenecks prevented the data packet from being forwarded.  The application layer data packets discarded in this manner were determined randomly because these packets all shared the same priority, and were not associated with an identifier identifying their priority relative to other application layer data packets.  Moreover, once packets were discarded, they could not be recovered by the router.  This is because conventional network routers operate in Layer 3 (the network layer) of the OSI (Open Systems Interconnection) model.  Although the receiver may request retransmission of a discard packet when a reliable data transmission

protocol is employed (e.g. TCP), for a real-time transmission of video this method may not result in recovery of the packet in time to be useful to the receiver decoder.

39.     In networking terms, Layer 3 is responsible for forwarding data packets from one network node to another.  Routers at Layer 3 inspect IP addresses, which are used to identify devices the network. They use these addresses to determine the best path for forwarding packets from the source to the destination.  A Layer 3 device forwards packets from one network node to another.  This involves looking at the destination IP address in a packet header and using routing tables, which are generated by algorithms (like OSPF, BGP, or EIGRP), to decide the optimal path for the packet.  After determining the best path, the router forwards the packet to the next hop in the network or to the final destination.  This forwarding decision is based on Layer 3 information, specifically the IP address.

40.     Moreover, a Layer 3 router is generally not aware of the specific type of information within application layer data packets, such as streaming video.  It operates based on the IP header, making decisions based on IP addresses and routing tables rather than the payload content.  This means it handles packets without inspecting their actual data, focusing on forwarding and routing them to their destination based on Layer 3 information.

41.     In contrast, the '372 patent claims are directed to a "video router" or a "scalable video router."  These are specialized routers that operate not only in Layer 3, but also in higher layers of the OSI Model, such as Layer 7 (the Application Layer).  Unlike network routers, which make routing decisions based only on IP addresses and network routing tables, Layer 7 aware routers may perform more advanced functions by inspecting information about the content of the application layer data packets.  For example, a Layer 7 aware router may inspect header information describing the content of packets to make routing or switching decisions based on

the type of application data they carry.  Layer 7 aware routers can also distribute incoming traffic across multiple servers based on application data, improving the performance and reliability of services.  They can enforce security policies by filtering traffic based on application-specific criteria, including blocking certain types of traffic based on their content or metadata.

42.    Importantly, video routers as taught and claimed by the '372 patent can optimize and manage traffic flows based on detailed application-level data, providing features such as caching and compression to enhance performance.  They can prioritize traffic based on the type of application, ensuring that critical applications receive the necessary bandwidth and low latency.  For example, a video router can prioritize packets corresponding to particular layers of the incoming video stream in response to insufficient bandwidth or increased congestion.  Overall, the claimed video router provides more granular control and optimization of streaming video traffic by understanding and interacting with the video data itself, rather than managing packet forwarding based solely on network-layer information.

43.    In this manner, the flow of video data packets over the distribution paths between the video router and each of the video receiving devices is more predictable, in contrast to the conventional practice of randomly discarding application layer data packets in the event of network congestion.

44.    The claims of the '372 patent, when considered as a whole, include several elements that improve the operation of video streaming systems and provide a specific technical solution to challenges in video streaming, such as managing video quality in bandwidth-constrained environments, improving the likelihood of reliable packet delivery of the video packets in specific scalable video layers, and optimizing the use of network resources.  These elements are rooted in real-world network management and video transmission technologies,

going beyond a generalized concept or abstract idea.  They require specialized hardware and

software implementations, such as algorithms for bandwidth assessment, real-time video

adaptation, and packet management over IP.  The combination of these features improves the

technical functioning of video streaming systems, offering an efficient, scalable solution for

delivering video content over variable network conditions.

45.     First, the use of layered video data streams allows for more efficient and flexible

use of network resources because the network can dynamically adjust the video quality to match

current network capacity.  This approach significantly improves bandwidth utilization by

avoiding the transmission of unnecessary data when the network cannot support it, reducing

network load and packet loss.  Prior to layered streaming techniques, systems would often

transmit fixed video streams, which would either overwhelm the network and/or degrade the user

experience with buffering or low-quality video.  The layered structure is an improvement

because it allows for a scalable and adaptable video delivery system, improving the overall

efficiency of network utilization.

46.     Second, the claimed ability to identify bandwidth-limited conditions in real-time

and adjust the forwarding of video layers accordingly allows the network to dynamically adapt to

changing conditions, rather than treating all receivers or all application layer data equally.

Specifically, the method analyzes the available bandwidth and adjusts the transmission of

encoded video layers to match the network's capabilities, reducing bottlenecks or failures in

transmission.  This element therefore makes the network more efficient in handling varying

conditions, enhancing network reliability and performance.

47.     Third, selective forwarding of one or more enhancement layers based on

bandwidth conditions represents an improvement in data management and processing by the

computer system or network device (e.g., the video router).  Rather than transmitting all application layer data equally, the computer system or video router prioritizes application layer data based on real-time network conditions, ensuring that essential application layer data (a base layer) is delivered even when bandwidth is low, and additional application layer data (one or more enhancement layers) is forwarded only when network capacity allows.  This type of intelligent application layer data processing reduces the load on the network routers and transmitting and receiving devices, as they are not required to handle the entire stream if bandwidth cannot support it.  Around January 2005, on the other hand, many systems lacked the ability to adapt in real-time to bandwidth conditions, leading to inefficient use of resources or degraded service.

48.    Fourth, the use of data packets encoded with sequence numbers and layer identifiers allows for structured and efficient transmission of layered video data.  Sequence numbers ensure that packets can be reassembled in the correct order at the receiver, identifying packet loss in the video stream.  Layer identifiers enable the system to distinguish between the base layer and enhancement layers, allowing it to prioritize and manage video transmission efficiently based on bandwidth conditions.  This packetization structure improves the overall efficiency of the network by reducing errors, enhancing reliability, and enabling scalable video delivery over IP networks.

49.    The above improvements to the operation of computers and computer networking therefore enhance the efficiency, adaptability, and performance of application layer data transmission in bandwidth-constrained environments over prior techniques in 2005.

50.    Furthermore, the claims of the '372 patent recite inventive concepts that are not merely routine or conventional use of data packet management.  Specifically, the use of a "video

router" or a "scalable video coding router" in the claims of the '372 patent was itself an innovation in the context of video streaming over Internet Protocol (IP) networks.

51.     Traditional network routers are designed for general-purpose data transmission, not for real-time video streaming that required adaptive quality control, especially in terms of adjusting transmission based on real-time network conditions.  Unlike conventional network routers which simply forward packets, a video router makes intelligent, real-time decisions about which video data to prioritize based on available network resources.  This approach allows the router to manage adaptive streaming by  selectively forwarding certain layers of the video stream depending on bandwidth availability.

52.     Further, the claimed video router is capable of identifying bandwidth-limited conditions on the IP network and selectively forwarding video layers based on these conditions. This is made possible because a video router may include integrated mechanisms for real-time bandwidth management and can perform real-time network performance analysis and dynamically adjust video streaming based on current bandwidth and network conditions.  This capability goes beyond conventional routers that were primarily concerned with forwarding application layer data packets without considering bandwidth fluctuations or prioritization of specific types of application layer data.

53.     In 2005, most routers operated on a best-effort basis, meaning they forwarded or discarded all application layer data equally without making distinctions between types of traffic or adjusting for bandwidth limitations.  The ability of the video router to identify bandwidth limitations and make intelligent decisions about which video layers to forward, and which to discard, was a significant improvement.  A video router can make real-time decisions about which layers to forward based on network conditions, enhancing the overall efficiency of video

Page 14 of 19

delivery.  This adaptive capability allows for more efficient use of network resources, reducing congestion and enhancing the user experience by maintaining video quality even when network conditions fluctuated.  This kind of real-time network management based on video data content was innovative as of January 2005, making the router an active participant in optimizing video transmission rather than a simple application layer packet-forwarding device.

54.    The claimed video router is also responsible for transmitting layered video data according to an Internet Protocol (IP).  While video transmission over IP was not new in 2005, the specific method of handling layered video streams and selectively forwarding them based on network conditions was an emerging area of innovation.  In doing so, the claimed video router transmits only the enhancement layers that can be received and decoded by each receiver based on network conditions and the capabilities of the receiver.  This means that the enhancement layers (and data packets) to be transmitted to each receiver are more predictable and deterministic during varying network conditions.

55.    Finally, the use of data packets encoded with a sequence number and a layer identifier allows the video router to recognize which packets belong to which video layer.  In traditional routers, there was no differentiation between different types of video data in terms of spatial, temporal, or quality layers.  In contrast, the inventive video router is able to identify and prioritize packets based on their layer (base or enhancement).  The claimed packetization system therefore represents a significant technical improvement over standard IP routers, which would not have been capable of such fine-grained control over video data.

56.    By integrating video-specific processing capabilities and performing the claimed functionality, the video router therefore becomes a specialized network device, unlike general-purpose routers.  In contrast, standard routers in 2005 were not designed with video-specific

tasks in mind.  They forwarded packets based on network addresses and routing tables, without

distinguishing between different types of application data (e.g., video, text, images).  A video

router that could understand the structure of video data and adapt its behavior based on the

unique needs of video transmission was a significant departure from the state of the art.  This

enhancement provided more robust video streaming capabilities, making the network more

efficient for handling multimedia content.  It also laid the groundwork for future streaming

technologies that relied heavily on adaptive and scalable video delivery, including the streaming

technologies implemented by the Accused Instrumentalities.

57.     Finally, the patented inventions disclosed in the '372 patent do not preempt all the

ways that video routers may be used to improve network management, nor does the '372 patent

preempt any other well-known or prior art technology.

58.     Accordingly, the claims in the '372 patent recite a combination of elements

sufficient to ensure that the claim in substance and in practice amounts to significantly more than

a patent-ineligible abstract idea.

59.     Because of these significant advantages that can be achieved through the use of

the patented invention, SVC believes that the '372 patent presents significant commercial value

for companies like Cisco.

**Related Litigation**

60.     The '372 patent was previously asserted in the District Court for the Central

District of California.  *Scale Video Coding LLC v. Brightcove, Inc.*, C.A. No. 2:21-cv-08156

(C.D. Cal.); *Scale Video Coding LLC v. NTT Cloud Communications US Inc.*, C.A. No. 8:21-cv-

01699 (C.D. Cal.); *Scale Video Coding LLC v. KDDI America, Inc.*, C.A. No. 8:21-cv-01700

(C.D. Cal.); *Scale Video Coding LLC v. Mitel Networks Inc.*, C.A. No. 8:21-cv-01701 (C.D.

Cal.); *Scale Video Coding LLC v. V-Cube USA, Inc.*, C.A. No. 8:21-cv-01702 (C.D. Cal.); and *Scale Video Coding LLC v. Zoom Video Communications, Inc.*, C.A. No. 8:21-cv-01704 (C.D. Cal.) (collectively "Prior Litigation").

61.    The '372 patent is currently asserted in this district against Cisco. *Scale Video Coding LLC v. Cisco Systems, Inc.*, No. 4:23-cv-00803-SDJ (E.D. Tex.) (the "Co-pending Litigation").

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 11,019,372

62.    The allegations set forth in the foregoing paragraphs 1 through 61 are incorporated into this First Claim for Relief.

63.    On May 25, 2021, the '372 patent was duly and legally issued by the United States Patent and Trademark Office under the title "Layered Multicast and Fair Bandwidth Allocation and Packet Prioritization."

64.    Plaintiff is the assignee and owner of the right, title and interest in and to the '372 patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

65.    On information and belief, Defendant has directly infringed at least claims 1, 6, and 11 of the '372 patent by making, using, providing, and/or causing to be used the Accused Instrumentalities, as set forth in detail in the attached preliminary and exemplary claim charts provided in Exhibits 2 and 3.

66.    Defendant has infringed and continues to infringe claims 1, 6, and 11 of the '372 patent during the pendency of the '372 patent.

67.    Plaintiff has been harmed by Defendant's infringing activities.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues triable as such.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment for itself and against Defendant as follows:

A.      An adjudication that Defendant has infringed the '372 patent;

B.      An award of damages to be paid by Defendant adequate to compensate Plaintiff for  Defendant's past infringement of the '372 patent, and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C.      A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of Plaintiff's reasonable attorneys' fees; and

D.      An award to Plaintiff of such further relief at law or in equity as the Court deems just and proper.

Dated: January 31, 2025    DEVLIN LAW FIRM LLC

*/s/ Robert Kiddie*
Robert Kiddie
rkiddie@devlinlawfirm.com
Joel Glazer
jglazer@devlinlawfirm.com
Srikant Cheruvu (*pro hac vice* to be filed)
scheruvu@devlinlawfirm.com
1526 Gilpin Avenue
Wilmington, DE 19806
Tel: (302) 449-9010
Fax: (302) 353-4251

*Attorneys for Plaintiff*
*Scale Video Coding LLC*